903 F.2d 234
 115 Lab.Cas. P 10,188
 Matthew A. DELGROSSO, James P. Blair Lester Ware, Jimmie
Mines, Jr., Joe Henry, Robert C. Trainer, Jay T. Richler,
Robert Hardwick, Jerome J. Phillips, Sr., Gilbert Weese,
Larry K. Hill, Charles G. Church, Jr., John R. Alves, Barry
K. Racz, Donald Lee Adams, Charles Woodrum, Richard W.
Martineau, Hubert J. Lee
v.
SPANG AND COMPANY.
Appeal of Matthew A. DELGROSSO, James P. Blair, Lester Ware,
Jimmie Mines, Jr., Joe Henry, Robert C. Trainer, Jay T.
Richler, Robert Hardwick, Jerome J. Phillips, Sr., Gilbert
Weese, Larry K. Hill, Charles G. Church, Jr., John R. Alves,
Barry K. Racz, Donald Lee Adams, Charles Woodrum, Richard W.
Martineau, and Hubert J. Lee, as well as the unnamed
plaintiff vested participants.
Matthew A. DELGROSSO, James P. Blair Lester Ware, Jimmie
Mines, Jr., Joe Henry, Robert C. Trainer, Jay T. Richler,
Robert Hardwick, Jerome J. Phillips, Sr., Gilbert Weese,
Larry K. Hill, Charles G. Church, Jr., John R. Alves, Barry
K. Racz, Donald Lee Adams, Charles Woodrum, Richard W.
Martineau, and Hubert J. Lee, Petitioners,
v.
SPANG AND COMPANY, Respondent,
Honorable Alan N. Bloch, Nominal Respondent.
 Nos. 89-3573, 89-3677.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 6, 1990.
Decided May 17, 1990.
Rehearing and Rehearing In Banc Denied June 18, 1990.
 
 Daniel P. McIntyre (argued), Falmouth, Me., William T. Payne, Kathryn L. Simpson, Grogan, Graffam, McGinley & Lucchino, Pittsburgh, Pa., for appellants/petitioners Nonvested Participants.
 John J. Kearns, III, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for appellants/petitioners Vested Participants.
 Hollis T. Hurd (argued), Jones, Day, Reavis & Pogue, Pittsburgh, Pa., for appellee/respondent.
 Before GREENBERG, SCIRICA and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 SCIRICA, Circuit Judge.
 
 
 1
 In this case, pension plan participants, former employees at the Lorain, Ohio plant of Spang & Company, appeal from a July 18, 1989 order of the United States District Court for the Western District of Pennsylvania, and petition this court for a writ of mandamus to compel the district court to comply with our earlier judgment in Delgrosso v. Spang & Co., 769 F.2d 928 (3d Cir.1985), cert. denied, 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986). We hold that the July 18, 1989 order is not final and thus is not appealable. We believe, however, that in this difficult and complex case, the district court has not fully implemented the judgment in Spang. Therefore, we will grant the petition for a writ of mandamus.
 
 I.
 
 2
 This case involves the allocation of surplus assets from a pension plan maintained under pension agreements between Spang and the United Steel Workers ("USW"). Spang operated ferro slag plants in Chicago, Illinois and Lorain, Ohio, which the company closed in 1979 and 1982 respectively. Nonvested participants from the Lorain plant sued Spang in 1982 alleging that the company refused to allocate surplus assets for the benefit of plan participants in violation of Sec. 404 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Sec. 1104 (1982), and Sec. 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. Sec. 185 (1982).
 
 
 3
 By orders dated June 1, 1984 and August 29, 1984, the district court granted summary judgment to Spang on all counts. App. at 1079, 1094. In a 1985 appeal, we held that the surplus assets could not revert to Spang nor were they available exclusively to the nonvested participants. Spang, 769 F.2d at 938. Therefore, we affirmed in part, reversed in part, and remanded the case with the following direction:
 
 
 4
 The district court, consistent with the foregoing opinion, is directed to: 1) grant summary judgment in favor of Delgrosso [the nonvested participants] on Counts III and IV[;] 2) reform the Spang Plan to provide that reversion to Spang of the Fund surplus is barred; 3) appoint a representative for the vested participants to represent them in the selection of an independent Plan administrator; and 4) under appropriate procedures, appoint an independent administrator of the Plan in the place of Spang.
 
 
 5
 Id. at 938-39.[1] Since then, the district court has presided over four status conferences and issued several orders, culminating with an order dated July 18, 1989, which provided:
 
 
 6
 [I]t appearing to the Court that no further action is contemplated by this Court at this time in the above captioned matter,
 
 
 7
 IT IS HEREBY ORDERED that the Clerk of Court mark the above captioned case closed.
 
 
 8
 Nothing contained in this order shall be considered a dismissal or disposition of this matter and, should further proceedings in it become necessary or desirable, either party may initiate it in the same manner as if this order had not been entered.
 
 
 9
 App. at 1267.
 
 
 10
 The vested and nonvested participants from the Lorain plant ("Participants") appeal from the order contending that the district court improperly and prematurely closed the case without fulfilling the Spang directives. Spang argues that the order is not final and appealable because it neither resolves the outstanding issues in the case nor precludes the parties from initiating further proceedings.
 
 
 11
 With certain exceptions not relevant here, the courts of appeals have jurisdiction under 28 U.S.C. Sec. 1291 (1982) to review only final decisions of the district courts. Demenus v. Tinton 35 Inc., 873 F.2d 50, 52 (3d Cir.1989). A final decision is one that " 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " Van Cauwenberghe v. Biard, 486 U.S. 517, 521, 108 S.Ct. 1945, 1949, 100 L.Ed.2d 517 (1988) (quoting Catlin v. United States, 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). The most important of the competing considerations in determining finality are "the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other." Dickinson v. Petroleum Conversion Corp., 338 U.S. 507, 511, 70 S.Ct. 322, 324, 94 L.Ed. 299 (1950).
 
 
 12
 In Patten Securities Corp. v. Diamond Greyhound & Genetics, Inc., 819 F.2d 400 (3d Cir.1987), we considered the appealability of an order that denied cross motions to dismiss, "administratively terminated" the action pending arbitration, and authorized reinstatement upon motion by either party. We held that the order was not a final judgment because it permitted reinstatement and clearly contemplated the possibility of further proceedings. Id. at 403.[2]
 
 
 13
 Similarly, the order in this case permits reinstatement and contemplates the possibility of future proceedings. The order does not purport to end litigation on the merits and the parties agree that it does not determine any issues or resolve the entire case. We recognize that the conduct of the district court raises the question whether the order effectively, if not expressly, brings the case to a close. On balance, however, we believe that the order is not final for purposes of Sec. 1291 and that the Participants' allegations regarding the conduct of the district court are properly addressed through a petition for a writ of mandamus.
 
 II.
 
 14
 The Participants contend that a writ of mandamus should issue in this case because, they argue, the district court has refused to resolve questions that are essential to fulfilling the Spang mandate: whether the Chicago assets are included in the Fund surplus and whether the Chicago employees are eligible to share in the surplus. Spang responds that the district court has carried out each of the Spang directives and that the Spang decision made clear that the Fund did not include the Chicago surplus. Moreover, Spang asserts that the Participants have foregone other opportunities for review.
 
 
 15
 "The decision to issue a writ of mandamus is largely committed to the discretion of the issuing court." Citibank, N.A. v. Fullam, 580 F.2d 82, 90 (3d Cir.1978). The writ is an extraordinary remedy, however, and should be issued only in exceptional circumstances. A party seeking the writ has the burden of demonstrating that its right to the writ is " 'clear and indisputable.' " Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 289, 108 S.Ct. 1133, 1143, 99 L.Ed.2d 296 (1988) (quoting Bankers Life & Casualty Co. v. Holland, 346 U.S. 379, 384, 74 S.Ct. 145, 148, 98 L.Ed. 106 (1953)). Moreover, the party must have no other adequate means to attain the desired relief. Helstoski v. Meanor, 442 U.S. 500, 505, 99 S.Ct. 2445, 2447, 61 L.Ed.2d 30 (1979) (quoting Kerr v. United States District Court, 426 U.S. 394, 403, 96 S.Ct. 2119, 2124, 48 L.Ed.2d 725 (1976)).
 
 
 16
 Courts understandably have been reluctant to issue writs because the action has "the undesirable consequence of making a district court judge a litigant." Citibank, 580 F.2d at 86 (citing Kerr, 426 U.S. at 402, 96 S.Ct. at 2123). More importantly, granting the writ in less than exceptional circumstances could encourage piece-meal litigation that would frustrate Congress' intent that appellate courts review only the final judgments of the district courts. Id. Nonetheless, courts have consistently issued the writ when a district court has failed to adhere to an appellate court mandate. Id. at 86-87 (citations omitted); see Gulfstream Aerospace Corp., 485 U.S. at 289, 108 S.Ct. at 1143 (federal courts have traditionally used writ only to confine district court to lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it has duty to do so). To do otherwise "would severely jeopardize the supervisory role of the courts of appeals within the federal judicial system." Citibank, 580 F.2d at 87.
 
 
 17
 Our judgment directs the district court to accomplish four tasks: 1) to grant summary judgment to the nonvested participants on Counts III and IV, an ERISA count and the LMRA count; 2) to reform the Plan so that reversion of the surplus to Spang is barred; 3) to appoint a representative for the vested participants; and 4) to appoint an independent administrator of the Plan in place of Spang. Spang, 769 F.2d at 938-39.
 
 
 18
 The district court granted summary judgment on Counts III and IV at the first status conference on June 23, 1986. App. at 1185-87. By order dated August 12, 1986, the court appointed a representative for the vested participants. App. at 1218.
 
 
 19
 Spang claims that it reformed the Plan by deleting Sec. 12.3(e), contained in the Pension Plan dated November 1, 1980 ("1980 Plan"), from its 1988 Pension Plan for Lorain.[3] In Spang, we determined that Sec. 12.3(e),[4] which permitted reversion of surplus assets to Spang, was inconsistent with the anti-reversion provision in Sec. 12.6 of the 1980 Pension Agreement between Spang and the Lorain employees ("1980 Pension Agreement").[5] Therefore, we held that Spang had breached its fiduciary duty under ERISA, 29 U.S.C. Sec. 1104, by failing to administer the Plan in accordance with the 1980 Pension Agreement. Id. at 935-36, 937.
 
 
 20
 Spang's claim that the Plan has been reformed is problematic. First, Spang deleted Sec. 12.3(e) from a 1988 Pension Plan that purports to apply only to the Lorain employees. A 1988 Pension Plan drafted by Spang for the Chicago employees still includes the reversion provision, at Sec. 12.2(e). See App. at 1337. Absent a district court order, it is unclear whether Spang's actions constitute the reform envisioned by this court. Second, and more importantly, the Spang court directed the district court to reform the plan. Clearly, the district court has not done so nor has it entered any order to confirm that the changes made by Spang constitute reform within the meaning of the judgment. Moreover, the district court's comments at one of the status conferences suggest that it intended to place responsibility for reformation on the plan administrator. See Second Status Conference (December 22, 1986), Transcript at 3, App. at 1221 ("In accordance again with the circuit's directions, he [the Plan administrator] is to see to it, first of all, that the plan is changed to prevent any reversion to Spang of any fund surplus.") Therefore, we fail to find any indication that the district court has carried out this aspect of the mandate.
 
 
 21
 The crux of the Participants' writ petition concerns the execution of the last of the four directives. By order dated February 5, 1987, the court appointed Dale B. Grant as independent Plan administrator. App. at 1230. In an August 5, 1988 letter, however, Grant informed the court that she would not serve because she was unable to secure fiduciary insurance to cover litigation by or on behalf of Spang or the Chicago participants. Grant's letter was no surprise. Her insurance problem had been discussed at the third settlement conference on June 26, 1987, App. at 1238-42, and again at the fourth settlement conference on July 8, 1988, App. at 1248-49. Resolution of the questions regarding the Chicago assets and participants would have alleviated Grant's litigation concerns. Grant wrote:
 
 
 22
 In this context, without insurance coverage, I cannot serve as plan administrator, unless the Court is going to make a determination as to whether or not the plan assets include assets that were originally attributable to the Chicago participants and whether or not the Chicago participants are eligible to share in the allocation of the plan assets. If the Court were to make these determinations and also confirm any allocation that I might propose after appropriate notice to all interested plan participants, I would be able to serve without further insurance coverage.
 
 
 23
 Letter from Dale B. Grant to District Court (Aug. 5, 1988), App. at 1399-1400. Since then, no progress has been made in acquiring comprehensive fiduciary insurance or in finding someone willing to serve as Plan administrator under the circumstances.
 
 
 24
 Thus, at the time the district court entered its July 18, 1989 order, the court had neither confirmed the reformation of the Plan nor secured the services of a Plan administrator. Moreover, although the district court entered summary judgment on Counts III and IV, it did not specify the relief granted. In July 1986, the nonvested participants filed a "Motion to Clarify or, in the Alternative, to Amend an Order Entered Pursuant to the Mandate of the Third Circuit." They contended that they were entitled to "all the monies in the pension fund.... including those derived from 'Chicago' contributions" and that "[t]here is no sub-category of 'Chicago' and 'Lorain' assets. The Court should clarify this matter once and for all in its Order." App. at 1198-99. On July 28, 1986, the district court denied the motion.[6] App. at 1217. It appears, therefore, that final resolution of three of the four Spang directives hinges on the status of the Chicago assets and employees. The district court has made it clear that it will not decide these issues. The Participants, the representative for the vested participants, and the administrator appointee repeatedly asked the district court to address the issues and in each instance, the court steadfastly refused to do so. At the first conference, the court stated:
 
 
 25
 [T]he Circuit seems to have given me four instructions, which I intend to follow, and they remanded it only for that purpose ... and those are the only four things I intend to do, and they didn't tell me to decide who is entitled to what at all.
 
 
 26
 . . . . .
 
 
 27
 I'm going to appoint a new administrator and an independent administrator. He or it is going to make those decisions....
 
 
 28
 ....
 
 
 29
 [A]s I see the remand, they haven't remanded it for me to make any of those decisions.
 
 
 30
 First Status Conference (June 23, 1986), Transcript at 11-13, App. at 1185-87. At the second conference, the court responded to questions regarding the Chicago assets as follows:
 
 
 31
 There is no way for me to interpret what the circuit meant when they say fund. I do not know what was in their mind or not. Now, you know, if there is a legal question involved as to who is entitled to share in the fund, I can make that decision. But I cannot make it on the basis of what the circuit intended. I do not know any more than you do what they intended....
 
 
 32
 ....
 
 
 33
 Wouldn't the appropriate method of proceeding be that, once we have an independent plan administrator, he is going to make some decision on that question?
 
 
 34
 Second Status Conference (Dec. 22, 1986), Transcript at 9, App. at 1227. Ms. Grant attended the fourth conference, at which the court commented:
 
 
 35
 [I]t was remanded to this Court with the following directions.... That's all it was sent back to this Court to do, and not to decide any other issues.... And, so, I guess, we then get back down to whether the independent administrator that the Court has appointed or wants to appoint is willing under those circumstances to assume that responsibility.
 
 
 36
 ....
 
 
 37
 I don't have authority to do anything else or to decide anything else.... And if you are unwilling to accept as the administrator of the plan under these circumstances, then I'm going to have to inform the Circuit that we have been unable to get ... an independent plan administrator to take over those responsibilities on the basis of the exceptions and the only proposed insurance coverage that's available.... [T]hen it's up to the Circuit to do whatever they want to do about it.
 
 
 38
 ....
 
 
 39
 It's been remanded to me for a very limited purpose ... and I intend to carry out that remand and not to do anything more than they remanded it to me to do.... I don't intend to get into that unless the Circuit tells me to get into it.
 
 
 40
 ....
 
 
 41
 And, you know, what legal problems that causes for all of you are things that you're going to have to consider, and how to properly raise those legal questions.
 
 
 42
 Fourth Status Conference (July 8, 1988), Transcript at 6-7, 9-12, 15, App. at 1252-61.
 
 
 43
 We believe that the district court has adopted too narrow a view of its authority on remand. In Bankers Trust Co. v. Bethlehem Steel Corp., 761 F.2d 943 (3d Cir.1985), we considered whether the district court had deviated from our mandate by failing to rule on outstanding issues on remand. Id. at 948. We stated that a trial court must implement both "the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." Id. at 949. When an appellate court directs the district court to act in accordance with the appellate opinion, as we did in Spang, the opinion becomes part of the mandate and must be considered together with it. Id. at 949-50 (quoting Noel v. United Aircraft Corp., 359 F.2d 671, 674 (3d Cir.1966)). Moreover, the district court "may consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision." Id. at 950. Thus, the court is free to make any order not inconsistent with the appellate decision as to any question not settled by that decision. Id.
 
 
 44
 Under the circumstances, the district court clearly had the authority to decide whether the Chicago assets are part of the Fund and whether the Chicago employees are eligible to participate in the Fund. The district court's refusal to make these determinations has left the case hopelessly stalled. The plan is without an administrator, and it is unclear what relief is available to the nonvested participants on their summary judgment and whether Spang's reformation of the 1988 Lorain Plan suffices. We find, therefore, that the district court has not fully implemented our judgment in Spang and that the Participants have a "clear and indisputable" right to a writ of mandamus.
 
 III.
 
 45
 When faced with a petition for a writ of mandamus, "it is for this court to construe its own mandate, and to act accordingly." In re Sanford Fork & Tool Co., 160 U.S. 247, 256, 16 S.Ct. 291, 293, 40 L.Ed. 414 (1895); see Hartford Accident & Indemnity Co. v. Gulf Insurance Co., 837 F.2d 767, 774 (7th Cir.1988). In Spang, we directed the district court to "reform the Spang Plan to provide that reversion to Spang of the Fund surplus is barred." 769 F.2d at 938-39. In our certified judgment, we stated: "It is further ordered and adjudged that any surplus assets may not revert to Spang nor are they available exclusively to Delgrosso [the nonvested participants]." July 30, 1985 Judgment (issued June 2, 1986), App. at 1173-74.
 
 
 46
 Considering the opinion and judgment together, we cannot agree with Spang's assertion that our decision was confined to the Lorain surplus. Our reference to the Lorain plant at the beginning of the opinion was not intended as a definition of the Fund--as Spang asserts--but rather as a description of the participants who had initiated suit. See Spang, 769 F.2d at 929 ("the non-vested participants in the Spang pension plan (the Fund) for its Lorain, Ohio ferro slag plant...." (footnote omitted)). Moreover, we fail to see how our statement that "[s]ubsequent to the effective date of the 1980 Pension Agreement.... the Fund was divided into two funds,...." id. at 930, indicates that our decision did not apply to the assets remaining after the purchase of both the Chicago annuity and the Lorain annuity.
 
 
 47
 Spang cites the following passage from our opinion as support for its position: "[A]fter provision for payment of the pensions, a surplus of over $100,000 remained in the Fund. It is this surplus which has given rise to this action." See id. at 931. Spang contends that this amount represents the company's contributions to the Lorain fund. Our reference, however, was to "surplus," not "contributions." Moreover, we note that this figure was used by the plaintiffs in their amended complaint and quoted by the district court in its June 1984 opinion. See Amended Complaint p 30, App. at 11 ("At the time of plant closure, there was in excess of 100,000.00 dollars in the pension fund beyond that needed to cover vested benefits."); Delgrosso v. Spang & Co., C.A. No. 82-2672 (W.D. Pa. June 1, 1984), App. at 1066 ("[P]laintiffs assert that, upon plant closing, over $100,000 remained in the pension fund beyond the sum needed to cover vested benefits...."). Our use of the phrase "over $100,000," therefore, was merely a reiteration of the plaintiffs' description of the minimum value of the surplus at issue. The passage was not intended, nor can it now be viewed, as a description of a "separate" Lorain surplus.
 
 
 48
 On the other hand, our frequent use of the terms surplus, assets, and fund without qualification or restriction demonstrates our understanding that the fund included both the Chicago and Lorain assets. As noted above, our judgment expressly prohibited the reversion of "any surplus assets." See Judgment, App. at 1173-74.
 
 
 49
 Spang reminds us that the controversy in the earlier appeal centered on the inconsistency between the reversion provision in the 1980 Plan and the anti-reversion provision in the 1980 Pension Agreement applicable only to the Lorain employees. We do not find this relevant to the question of whether the Fund included both the Chicago and Lorain assets. Moreover, we noted that "[s]ince 1970 all pension agreements have contained a clause unequivocally prohibiting any reversion to Spang of its contributions." Spang, 769 F.2d at 930 (emphasis added). We concluded that "any plan provision permitting reversion of the Plan assets to Spang is not 'in accordance with the documents and instruments governing the plan.' " Id. at 935-36 (quoting 29 U.S.C. Sec. 1104(a)(1)(D) (1982)) (emphasis added). These statements demonstrate that our opinion cannot be read as narrowly as Spang urges.
 
 
 50
 The Participants also contend that the equitable doctrine of judicial estoppel bars Spang from now asserting that our judgment applied only to the Lorain surplus. This doctrine precludes a party from assuming a position in a legal proceeding that contradicts or is inconsistent with a previously asserted position. Oneida Motor Freight, Inc. v. United Jersey Bank, 848 F.2d 414, 419 (3d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988); see Lewandowski v. National Railroad Passenger Corp. (Amtrak), 882 F.2d 815, 819 (3d Cir.1989); Murray v. Silberstein, 882 F.2d 61 (3d Cir.1989); Scarano v. Central R. Co., 203 F.2d 510, 513 (3d Cir.1953); C. Wright, A. Miller, E. Cooper, 18 Federal Practice and Procedure Sec. 4477 (1981 & Supp.1990). Unlike the concept of equitable estoppel, which focuses on the relationship between the parties, judicial estoppel focuses on the relationship between the litigant and the judicial system, and seeks to preserve the integrity of the system. Oneida Motor Freight, 848 F.2d at 419. To permit a party to assume a position inconsistent with a position it had successfully relied upon in a past proceeding "would most flagrantly exemplify ... playing 'fast and loose with the courts' which has been emphasized as an evil the courts should not tolerate." Scarano, 203 F.2d at 513 (quoting Stretch v. Watson, 6 N.J.Super. 456, 469, 69 A.2d 596, 603 (1949), rev'd in part on other grounds, 5 N.J. 268, 74 A.2d 597 (1950)).
 
 
 51
 In its brief to this court in the 1985 appeal, Spang asserted:
 
 
 52
 All pension trust monies which remained after the Chicago employees were awarded their pension benefits remained in the pension trust fund (A. 276, 688-689). The current pension trust is therefore comprised in substantial part of funds attributable to Chicago employees (A. 688-689).
 
 
 53
 Brief for Spang & Co. at 14 (Jan. 21, 1985), Delgrosso v. Spang & Co., 769 F.2d 928 (3d Cir.1985) (No. 84-3618, No. 84-3644) (emphasis added), cert. denied, 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986). The brief also contained the following declaration:
 
 
 54
 Spang does not concede that there exists a surplus of pension assets attributable to the Lorain, Ohio facility. Much of the pension trust consists of funds and investment growth attributable to Spang's slag processing facility in Chicago, Illinois which was closed in 1979 (A. 688-689). Under no possible interpretation are Appellants, former Lorain, Ohio employees, entitled to assets attributable to work performed by former Chicago employees.
 
 Id. at 10 n. 3 (emphasis added).[7]
 
 55
 Similarly, in its brief to the district court in support of summary judgment, Spang stated:
 
 
 56
 Even if Plaintiffs are somehow deemed entitled by the Court to more than their accrued pension benefit, they are not entitled to all remaining funds in the pension trust.
 
 
 57
 As previously noted, a substantial portion of the current pension trust fund balance is attributable to the carryover of surplus from the Chicago closing.
 
 
 58
 Brief of Spang & Co. at 33, Delgrosso v. Spang & Co., C.A. No. 82-2672 (W.D.Pa.1984) (emphasis added); see also Pretrial Narrative Statement of Spang & Co. at 5, Delgrosso v. Spang & Co., C.A. No. 82-2672 (W.D.Pa.1984), App. at 634 ("[T]wo prior facility closings in Homestead, Pennsylvania and Chicago, Illinois provided employees of those facilities with their pension benefits.... Remaining surplus after payment of the foregoing sums was retained in the pension fund.")
 
 
 59
 Clearly, Spang's position in this phase of the litigation is inconsistent with the position it assumed in the earlier phases of this litigation. Moreover, application of the doctrine of judicial estoppel is particularly appropriate in situations like this, where the party benefited from its original position. Murray, 882 F.2d at 66; see Scarano, 203 F.2d at 513. Although Spang failed to persuade this court in 1985 that the surplus should revert to the company, it was successful in convincing us that the surplus was not available exclusively to the nonvested participants. See Spang, 769 F.2d at 938. We concluded that the parties to the 1980 Pension Agreement could not have anticipated the existence of such a large surplus and could not have intended the surplus to be distributed among the nonvested participants. Id. at 936-37.
 
 
 60
 Under the circumstances, therefore, we hold that the judgment in Spang applies to the surplus assets of both the Lorain and Chicago facilities. We are unable to point to anything indicating that the Spang panel considered or decided the rights of the Chicago employees. As we have noted, however, a district court has the authority to decide issues on remand that were not disposed of by the appellate court. See Bankers Trust Co., 761 F.2d at 950. We recognize the extensive efforts of the district judge in this complex case. Nonetheless, the Spang judgment could not be discharged absent a decision on the questions regarding the Chicago employees and the Chicago assets. We believe the district court should have addressed these issues.
 
 IV.
 
 61
 For the reasons discussed, we hold that the order of the district court dated July 18, 1989 is not final and appealable under 28 U.S.C. Sec. 1291. Therefore, we will grant Spang's motion to dismiss the appeal (No. 89-3573).
 
 
 62
 We will grant the Participants' petition for a writ of mandamus (No. 89-3677). We direct the district court to reopen the case, to carry out each of the directives set out in our prior judgment, and to issue appropriate orders with respect to each directive, all in accordance with the foregoing opinion and the opinion in Delgrosso v. Spang & Co., 769 F.2d 928 (3d Cir.1985), cert. denied, 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d 692 (1986). Furthermore, we direct the district court to resolve all issues not expressly or implicitly disposed of by this court, as is necessary to effectuate the judgment and in a manner consistent with both opinions, including but not limited to questions involving the Chicago employees[8] and whether Spang has appropriated any part of the surplus.
 
 
 
 [1]
 The certified judgment, dated July 30, 1985, was issued in lieu of a formal mandate on June 2, 1986, after Spang's petitions for rehearing and certiorari had been denied. See App. at 1171-74
 
 
 [2]
 Applying the Enelow-Ettelson doctrine, we found, however, that because the underlying action was one at law, that part of the order that amounted to a stay pending arbitration was appealable under 28 U.S.C. Sec. 1292(a)(1) (1982). See Patten, 819 F.2d at 403-05. Subsequently, the Supreme Court overturned the cases establishing the Enelow-Ettelson doctrine and held that "orders granting or denying stays of 'legal' proceedings on 'equitable' grounds are not automatically appealable under Sec. 1292(a)(1)." Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 287, 108 S.Ct. 1133, 1142, 99 L.Ed.2d 296 (1988). But see 9 U.S.C. Sec. 15 (1988) (Appeals)
 
 
 [3]
 Spang had unilaterally drafted the 1980 Plan to comply with ERISA's requirement of a permanent plan document. See Spang, 769 F.2d at 930 (citing ERISA, 29 U.S.C. Sec. 1102(a)(1) (1982))
 
 
 [4]
 Section 12.3(e) provided:
 To the extent there remains a surplus of assets of the trust fund after fully funding all of the above-determined liabilities due to benefits payable under the Plan, such surplus shall be considered an actuarial surplus and shall be returned to the Company.
 1980 Plan, Sec. 12.3(e), App. at 941.
 
 
 [5]
 Section 12.6 provided in part:
 The contributions made by the Company hereunder may not, under any circumstances, revert to the Company. If this Pension Plan shall terminate, the funds under the Pension Fund shall be used in the manner provided in Section 13.
 1980 Pension Agreement, Sec. 12.6, App. at 860.
 
 
 [6]
 Spang contends that the petition for a writ of mandamus should be denied because the Participants failed to appeal the July 28, 1986 order under 28 U.S.C. Sec. 1291 (1982) (pursuant to the collateral order exception) or 28 U.S.C. Sec. 1292(b) (Supp. V 1987) (by certification of the order for appeal on a controlling question of law). The Supreme Court has stated that an order which does not finally resolve litigation is nonetheless appealable under the collateral order doctrine if it " 'conclusively determine[s] the disputed question,' " " 'resolve[s] an important issue completely separate from the merits of the action,' " and is " 'effectively unreviewable on appeal from a final judgment.' " See Gulfstream Aerospace Corp., 485 U.S. at 276, 108 S.Ct. at 1137 (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978)). Spang fails to explain how the July 28, 1986 order satisfies this test or what controlling question of law is implicated in the order. We find no merit in Spang's contention
 
 
 [7]
 According to Spang, the last sentence from this quotation demonstrates that it did not "cede" the combined surplus to the appellants in the initial appeal. While that may be, it is irrelevant to the question before us. The passage clearly shows that Spang believed and asserted that the surplus at issue in the 1985 appeal consisted at least in part of funds attributable to the Chicago facility
 
 
 [8]
 This includes but is not limited to the issues of notice and representation for the Chicago employees and whether the Chicago employees are entitled to participate in any distribution